D. B. v. Ithaca City School District. My name is Ed Kopko. I'm an attorney representing D. B. L. B. is a student with a nonverbal learning disability. It's a pervasive disorder that affects every aspect of her life and generally affects about 1% of the student population. It has an effect upon her psychological aspects, her emotional aspects, her intelligence, her ability to learn. She requires, in the most strict sense of an individualized education plan, something that fits her. I submitted to the court the most recent Supreme Court decision by my Rule 28J letter, the Enders v. Douglas County case, where the Supreme Court reiterates the statutory framework for developing an IEP. The court directs that this is to be an interactive process between the school district, the parents of the student, and the student's consultant. That did not happen here. In fact, it has never happened. There have been a number of IEPs developed for this student, but none of them have worked. Here's the reason. Because of the particular... Mr. Kopko, is your argument that there was no participation on behalf of the child, or is your argument that there was plenty of participation, but what they came up with ultimately didn't work as well as would have? Both, sir, and here's how that worked. The parent hired a Cornell-trained educational psychologist to try to get to the root of this matter. She prepared a very detailed report found at page 42 through 75 of the record here. Part of her report was an extensive analysis of the nonverbal learning disability. And was the report submitted to the appropriate committee? Yes, sir. Yes, sir, it was. And it is our contention that the committee did not weigh that. And this is the most striking part about this case. So you're saying they just totally disregarded it, paid no attention? Well, that sounds a little bit harsh, sir. I can't go so far as to say that they totally... Well, I did because I thought it a fair characterization of what you just said. The answer to Your Honor's question is no, they didn't disregard it. They did not understand it. And there's a significant difference in that. They didn't understand it because the school psychologist, and this is in the record before the IHO at about 95 through 110, the school psychologist actually admitted that there is no such thing as a nonverbal learning disorder. It does not exist. Well, as a recognized condition, but the deficiencies that informed that disorder as identified by the psychologist, your adversary argues were all identified by the IEP that was prepared for L.B. So to that extent, I'm concerned that we not be focusing on labels as with what the child's needs were. Can you tell us what it was that the child needed that was not captured in the challenged IEP? Yes, Your Honor. Perhaps it's easiest to understand this by thinking about a very small player on a baseball team, and that player is given a very extra-large uniform. Now, that player has everything that all the other players have. They have a uniform and socks and a jersey, and by all the outward trimmings, that player is getting what he needs to be part of the team. What is missing here is the psychological aspects of it. What effect would that have on that player actually being made to stand out because the player's standing there in a sloppy big uniform? The analogy doesn't help me. The identified needs for this child in the respondent's papers are that she did have poorly developed perceptual reasoning skills. She had difficulty sustaining attention. She had depression. She had anxiety. She needed a nurturing environment. She needed structure. She needed supervision. She needed predictability. And so they came up with a plan that provided for her to be in a situation where she would be in a 5-to-1 student-teacher research room program, and that's a defined program under the state. She got direct daily consultant teacher services in math. She got weekly counseling, and there was directions about breaking information into chunks, providing her with routines, providing her with access to a computer. I'm trying to understand, in that analysis, what's the need that is not captured, or how are the responses somehow inadequate to the needs? I can explain that readily. Because your client is seeking compensation for the placement of the child in a residential facility, is that correct? Yes, Your Honor. So not at home and not in a regular school. Yes. Yes, Your Honor. That is a situation that, as I understand the law, school boards are generally told to proceed with only when it is impossible to teach the child or to provide an IEP in a regular school and with the child being able to stay at home. Impossible may be a little bit strong here. The standard is, does this meet the needs of the child? And this does not. Everything that Your Honor described are all of the outward trappings of just a common, everyday IEP. For example, if you look on page 81, it's the actual IEP. This does not seem to be exactly what I've seen in other cases. So answer my question. What's the need that's not captured by this IEP? The need is this child has to be in an educational setting where her actual mental workings, her spatial dissonance, the fact that she needs very closely to be monitored and repetitive teaching and methods that allow her mind to work as it exists. Everything that Your Honor is describing, the classroom, the number of teachers, having a computer to assist her, that's what every disabled child gets, what this child needs and never receives. I understand that. I have read any number of IEPs that do not put children in 5-to-1 programs. They put them in some other kind of programs. I have not always seen IEPs that say, this child needs a computer to help her communicate. I'm just not prepared to accept that this is a cookie-cutter IEP. When you look at the child's needs as described by the parent psychologist, it becomes clear that what she needs is the type of residential setting where they recognize and they understand a nonverbal learning disability, and they can address that. They do it not in the ordinary setting that a public school does. They do it in a setting that understands the full and complete nature of her disability and how she has to learn on an individualistic basis. That did not happen here. Any disabled child could have gotten pretty much the same IEP here. It didn't work for this child because the school district admitted that they never really understood the nature and the scope of a nonverbal learning disability. And where is that admission in the record? That admission is in the testimony of the school psychologist, I believe, on pages 91 through 105. Isn't it also at page 220 of the joint appendix that nonverbal learning disability is not formally recognized as a psychiatric diagnosis by the medical literature as yet or by New York State? Yeah, here's the strange thing about that, Your Honor. The school district had, on prior occasion, actually diagnosed her with a nonverbal learning disability. They had actually diagnosed that. So here you have this incongruity where the district is now arguing, hey, this nonverbal learning disability, this doesn't really work. We don't even recognize it in the literature. And when you look... It's a diagnosis, but I don't understand. Why is the diagnosis so critical if the if, and you have to accept this as part of the hypothetical I'm asking you, they identify what her needs are? They did not identify the needs, Your Honor. That's the whole crux of what I'm trying to... But are you saying that... I understand that you want X and they concluded Y, but it does not follow from those two propositions that they didn't understand this. Well, sir, I say that they didn't understand this because the school psychologist who was part of the Committee on Special Education who voted for the IEP admits that there was no such thing as a nonverbal learning disability. I misquote... 91 and following? Pardon me, sir? And this is what you referred to as being at 91 and following? Yes, and I misquoted that, Judge. What I was telling you were the pages of the transcript itself.  So from page 91 of the transcript... Excuse me, 95 of the transcript. No, that's... I beg your pardon. I gave Your Honor the wrong site. The part that I'm inviting Your Honor's attention to begins in the actual numbering of the record at 221. Thank you. And I beg Your Honor's pardon. Are you saying, then, that any child who is diagnosed by a psychologist as having a nonverbal learning disability requires a residential setting as a factor? Oh, no, by no means, Your Honor. I'm still having the trouble that Judge Radji identified, was what precisely was required for her plan to be adequate here? What activities, what accommodations, what... Because your response really was that she needed a setting in which people understood that there is such a thing as a nonverbal learning disability and she needed to feel not different from others. Well, but, Your Honor, that point is so important because it has such a pervasive effect upon her ability to learn. In this residential setting at Greenbrier, they are set up for children that have this particular type of disorder, where... Isn't that the equivalent to saying, then, that any child with a nonverbal learning disability needs to be in a residential setting? Yes, I think that that may be... And I think, Your Honor, it is on to something there. I think that a school district who does not recognize this sort of disorder certainly could not be equipped to address it. And I think, Your Honor, has a good point, that the very few students that are afflicted with this do need a residential setting. It seems very drastic, given the variability of the diagnostic techniques employed and variability of professional opinions, and much more useful and appropriate in determining what a tailored plan would be to look at the individual characteristics of a child and look at specific aspects of a plan as being adequate or inadequate. Well, Your Honor, when we look at the mandate of Congress under IDEA, that all children, as a matter of public policy in the United States, are going to get an education, and then when we look at the most recent... An appropriate education. An appropriate education, yes. Thank you, Your Honor. An appropriate education. And then when we look at the most recent Supreme Court case interpreting that in Enders, and the Supreme Court case says that in formulating the IEP, we have to rely upon the expertise of the district. Now, in this case, where the district admits that they do not have that expertise, I say that under Enders, this child was entitled to that residential setting. I'm not sure how you can make that argument in light of the testimony at trial that the nonverbal learning disability, as a diagnosis, the evidence was, is controversial in the field. The research doesn't necessarily support that. It's not recognized by the state of New York as a category of disabilities, nor by IDEA. It's not in the DSM as a psychiatric diagnosis. So there are different researchers who have tried to come to conclusions. But so we've got a diagnosis that's controversial. That seems to me that the default comes back to what are the child's identified needs, and does this IEP meet them? And you still haven't identified what need it is. She needs one-on-one as opposed to five-on-one. She needs, you know, whatever else you think she needs. You haven't identified anything that she needs that she didn't get here, and I'm having trouble, therefore, with your argument. Most respectfully, Your Honor, continues to focus on the one-to-one teaching ratio. I don't think anybody said she needed one-to-one. I hypothesize that to you. For you to tell us she got five-to-one, she got other things, what is it she needed that she didn't get? She needed some pedagogical program where her teachers understood her very individualistic learning disabilities. That are not... She has a spatial disorder. She has a very significant emotional aspect of being isolated. To have anxiety and to need a lot of reinforcement, that was recognized. I beg Your Honor's pardon. We've kept you a long time. Why don't we hear from your adversary and then let you rebut, okay? Thank you. Thank you. Thank you. Good morning. May it please the Court, Kate Reed, General Counsel for the Ithaca City School District. I'd like to begin with something that Mr. Kopko began with, which was the interactive process and the IDEA and the importance of that interactive process. And I believe where Mr. Kopko began was that that process never happened in this case, and I would concur with that. But for a different reason, I believe, than my adversary, which is the history of this case. The parent withdrew this child from the Ithaca City School District in fourth grade. The Ithaca City School District has not seen this child since fourth grade. She was parentally placed homeschooled. She's how old now? She is now, I believe, in 11th grade. Yes, yes. So withdrawn in fourth grade, placed in private school, withdrawn from private school, homeschooled, returned to private school. She returns to the Ithaca City School District in the spring prior to the commencement of her eighth grade year, when we have not seen her for four years. So at that point, the parent approaches the CSE, requests placement in the district, indicates for all intents and purposes the child's returning to the district, and unbeknownst to the district, on July 6th, I believe, if the record reflects, that the parent then turned around and unilaterally placed the child at Greenbrier Academy before the CSE had convened, before she had engaged in that interactive process with the CSE. She then turned up at the CSE meeting with a report prepared by a private consultant, handed that consultant's report to the CSE as an ultimatum containing a residential placement recommendation. She walked out after 10 minutes. She provided no input whatsoever regarding what she wanted in that IEP, what placement was necessary, what services were necessary for her child. The CSE then said, well, we hadn't had a chance to see this report. We're seeing it for the first time on the day of the CSE. Let's reconvene after we've all had a chance to digest. Let's revisit the IEP, re-invite the parent in. And what I would contend is that the IEP that came out of that process, notwithstanding the parent's lack of participation, reflects every functional limitation identified by her own consultant. And this is why Mr. Kopko is having difficulty identifying any specific need, any specific need for this child that was not addressed in that IEP through a specific service. And I think it is telling that neither before the IHO, before the SRO, and then subsequently in front of the Northern District of New York, has there been any substantive deficiency in either our understanding of this child's needs, the sufficiency of her evaluations, the program that was ultimately put in place, and those very, very robust supplementary aids and services. Yes, Your Honor. Even the SRO found a procedural violation insofar as L.B. failed to receive updated testing, as requested by the school district's committee on special ed. But then the SRO thought that that procedural omission was not one that warranted any relief because the CSE had sufficient information otherwise to develop an IEP. But, you know, as you tell us this tale of what happened here and its complexities, it seems to me that's another pertinent piece. Now, do you want to shed any light on that beyond what I understand? I would love to shed some light on that. So that is correct. So what the SRO recognized is that there is a notation in the meeting minutes following the second meeting of the CSE where the CSE indicated that perhaps some updated testing might be necessary. The areas that were specifically identified, bear with me, were that some additional testing in social, emotional, attention, academic achievement, and assistive technology could be conducted. So I think we turn to this Court's test as identified in the CF case for when a procedural violation amounts to a denial of FAPE in an IDEA case. And the law is very, very clear that a procedural violation will only amount to a denial of FAPE if it substantially impeded the child's right to FAPE, if it significantly impeded the parent's participation rights, or otherwise caused some substantive interference with the child's right to an education. So we look at what happened in this case. The parent had already unilaterally enrolled this child at Greenbrier Academy in July. So we can pontificate about what would have happened if this child had come to us and we had an opportunity to implement this IEP on September 1st. And I think that notation merely indicates that based on additional information that was shared by Dr. Gregorio, the parent's consultant, that the district was willing to consider some additional testing. My opinion is that the SRO's observation that that was a procedural violation and not a substantive violation is supported by the fact that if we look at the areas that the district proposed to retest, the record is replete with ample evaluative data in each of those areas.  That was one of the areas that was identified. The district's own school psychologist administered the BASC. That is an intensive psychological assessment both to the parent and to the child and obtained information about the child's emotional state and her relationship with her education based on that testing. And there's a service that correlates with the needs identified by that testing in the IEP. It's counseling. The child is going to receive individual counseling in school. There's also the reflection of a goal, a social-emotional goal. So to the extent that the CSE said, we can conduct some additional social-emotional testing, that area had already been very amply tested at that point. The other piece was attention. The district was willing to conduct some additional testing in that area. Well, we look at the horsehead's evaluation that the child came to us with. The WISC had been performed. It identified already that she had some perceptual difficulties, that she had some processing difficulties, that long-term memory might be an issue for her. So we had that from the prior district. We also had the district's own updated psychoeducational testing. Finally, we had this comprehensive report from the parent's own consultant that likewise identified the child has some attentional difficulties. So it seems that there was a failure of the collaborative process, though perhaps not the school board's responsibility. I would agree. Nonetheless, do you agree that there might be some disabilities that require residential placement? Unquestionably. Unquestionably. And do you think that there may be emerging practices in the educational fields in which new disabilities are being recognized? And here we have one that was diagnosed by the parent's consultant, although perhaps controversial. And you had the school district saying, we don't really buy that, we don't really understand, we're not versed in that, and nonetheless you're taking the position that they were able to deal with it because of these kind of atomistic functional offerings that the IEP made. But it's a little disconcerting still to have what seems to be a diagnosis that's a kind of whole package that the school says, well, we don't really know, it's not a label that we recognize, and so we reject the premise that something more is required. Could you put me at ease about that? Yes, I'd love to speak to that. So I think if we look at the testimony itself, and my opponent drew your attention to page 220 of the record, where that testimony really came to light. So what our district witnesses were testifying to in that space at that time was that from their standpoint, there are the 11 enumerated IDEA disability categories, and one of those is learning disability. And what the school psychologist was speaking to was, it's not a diagnosis in the DSM, so we can't attach that label to it. Furthermore, it's not a category under the IDEA. So in other words, when we prepare that grid on the front page, we're not going to say non-verbal learning disability because the state doesn't allow us to do that. But that doesn't mean we can't program and develop supplementary aids and services that are specifically addressing the facets of that disability. So I would contend that the court was asking precisely the right questions of Mr. Kopko, which is to what extent did the fact that the state doesn't recognize this label mean that the district cannot program for a child whose learning disability happens to affect them in the mathematical realm? That's really what we're talking about. We're talking about a child here who, on all objective measures, was functioning at grade level or above grade level in pretty much every domain. The only area in which she was struggling, by all objective testing, was in that perceptual piece that correlated with her math quantitative skills as well as in the social behavioral realm. What about anxiety and the emotional overlay? The emotional overlay. So my opponent's perspective is that that's part and parcel of the non-verbal learning disability. I don't think the district would dispute that. And I think that's reflected in the IEP and the present levels of performance sections where my client clearly indicated this disability causes this child to have anxiety in a classroom setting. It causes her to have difficulty relating and forming that connection with teachers in the first instance. And the data from that was derived not only from the private consultant's report but also from the district's own behavioral testing. So I think Mr. Kopko's characterization that the district disavowed non-verbal learning disability is a complete mischaracterization of the record. What the district did was, throughout time, since the first IEP they prepared for this child, going back to fourth grade, they recognized that she has a mild learning disability, that impacts her predominantly in the non-verbal domain and provided supports to target that area. So to my mind, whether the psychologist says, well, there's some doubt about the existence of this diagnosis, the research about this diagnosis in the DSM, that's completely irrelevant. And you would say that there's nothing in the testing and the evaluation package overall that indicated that the only place that she could receive an appropriate education was in a residential setting away from the public school? I would say that it's not just not supported by the record. I would say it's completely contrary to the least restrictive environment mandate of the IDEA. But we would get to that only when we decide whether or not your IEP is satisfactory, right? Whether or not, if we would have to conclude yours was not, and then the question would be whether the residential placement was. That's correct, Your Honor. Although what I would say is I think if we look at my adversary's position in this case from day one, it's essentially been because you don't agree that she needs a residential placement, the IEP is deficient. So that is our perspective. Thank you very much. Thank you. Counsel, Mr. Kosko, you have some rebuttal time. Sorry. Go ahead. Judge Kaplan, a specific answer to Your Honor's question at page 239 in the record. This is the examination of the school psychologist who reviewed the parent's report about the educational setting. I believe that I stated in my professional opinion, I don't believe that a nonverbal learning disability in and of itself exists in the first place. And wasn't there another witness from the district who testified that the diagnosis was controversial, that there were disagreements within the district about this being an appropriate or recognized diagnosis? And so where does that get you? Sir, that's the whole point about this stuff. You have one school psychologist saying nonverbal learning disability doesn't even exist. You have another school psychologist saying – Look, I'm sorry. That's what I really just don't get. And maybe you can help me. What you have at best, I think, is whether a particular package of conditions or symptoms constitutes, for want of a better term on my part, a syndrome to which a particular label ought to be affixed. And, yes, there are disagreements about whether that's appropriate. To take it out of this realm to another one, there is a great controversy, or at least used to be, may still be, in the medical profession about fibromyalgia is a diagnosis in and of itself for sort of widely disseminated muscular or soft tissue pain through the body or not. But nobody denies the symptoms. So the whole point of this case is did the district understand what the problems for this child were and address them appropriately, not whether they put the right label on that, in the opinion of your psychologist as distinguished from other psychologists who say, you know, it's not a labelable group of things as a collectivity. Excuse me. When you respond to that, I'll just ask you to bear in mind at page 237 the same witness said that whether or not I believe that the nonverbal learning disability exists in and of itself is irrelevant to the child and her individual needs, and that's what I was focused on. So that's my concern, is whether you have to show us not simply that this psychologist fell on the side of the controversy that doesn't recognize this condition as a unique disability, but whether he failed as a result to identify the child's needs. Unequivocally, Your Honor, yes. They failed to do that. And the reason that they failed to do that, and this is in answer to Your Honor's question, I invite the Court's attention to page 59 and to page 60 of the record. That's where the parent's school psychologist lists the very specific needs that the residential setting would provide to this child in order to meet her minimum educational requirements. Which of these is not identified and not provided for in the IEP? Almost none of them, Your Honor. Almost none of them. I'm not sure I understand that. The very first one is a nurturing environment that is structured, supervised, predictable, and consistent across all settings. Now, how did the IEP, which does provide for, which recognizes the need for consistency and supervision, not recognize that need and then not provide for it? I mean, I have a real problem with you saying they didn't recognize the need. Your Honor, it's the point that I was trying to set before. Putting this child in a 5-to-1 classroom does nothing to recognize the individualistic nurturing environment that is being recommended by the expert here, that she needs teachers who understand the nonverbal learning disability, that on an immediate basis that she needs to be reinforced, that information has to be repetitively presented to her. That's the uniqueness of this. This is a cookie-cutter IEP that doesn't address, for all of these reasons that Your Honor had asked me earlier, for all of these reasons, this is why a residential setting is necessary. And Judge Kaplan, you talk about this fibromyalgia, and I think Your Honor is totally correct about that because years ago this was dismissed by the medical communities, and for a long time it wasn't recognized. We now have a whole body of science that establishes that, in fact, this is a true phenomenon, that people do this. This is no different than what we have right here. We're having enough trouble with this trial. I'm sorry I introduced the analogy. Thank you very much. I think we understand your argument. We'll take the case under advisement and we'll try to get you a decision. Thank you both very much.